**No. 21-36048**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

JENNIFER MILLER; EMAD AL-KAHLOUT; JOSE GRINAN; KELLY
KIMMEY; JUMA LAWSON; HAMADY BOCOUM; PHILIP SULLIVAN;
KIMBERLY HALO; CHRISTOPHER CAIN; GARY GLEESE; CLARENCE
HARDEN; STEVEN MORIHARA; SHARON PASCHAL,

*Plaintiffs-Appellees*,

v.

AMAZON.COM, INC.; AMAZON LOGISTICS, INC.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:21-cv-00204
Hon. Barbara J. Rothstein

_____

**PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

_____

Hillary Schwab, Esq.
Brant Casavant, Esq.
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
hillary@fairworklaw.com
brant@fairworklaw.com

Beth E. Terrell, Esq.
Toby J. Marshall, Esq.
Jennifer Rust Murray, Esq.
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
(206) 816-6603
bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com
jmurrary@terrellmarshall.com

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iiii

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 1

STATEMENT OF THE CASE .............................................................. 1

SUMMARY OF ARGUMENT .............................................................. 4

ARGUMENT ................................................................................ 7

I.          PLAINTIFFS IN THIS CASE ARE PART OF A "CLASS OF
WORKERS" EXEMPT FROM THE FEDERAL ARBITRATION ACT. ............. 7

    A.    The Supreme Court's decision in *Saxon* confirms that the FAA does
not apply to Plaintiffs' claims. ................................................... 7

        1.   Under *Saxon*, workers who handle goods bound for or coming
from out of state are workers in interstate commerce. ............... 7

        2.   The class of workers at issue in this case is Amazon Flex
delivery drivers. ..................................................................... 12

        3.   Amazon Flex delivery drivers are engaged in foreign or
interstate commerce. .............................................................. 14

    B.    Under this Court's decision in *Rittmann*, Plaintiffs are part of a class
of workers engaged in foreign or interstate commerce and are subject
to the § 1 exemption to the FAA. ............................................... 15

    C.    Like the plaintiffs in *Rittmann*, Plaintiffs and other Amazon Flex
drivers perform last-mile deliveries and are engaged in interstate
commerce, and the substance of the claims in the case does not
change that. ......................................................................... 27

        1.   The evidence demonstrates that Plaintiffs performed last-mile
deliveries, just like the Amazon Flex drivers in *Rittmann*. ....... 28

        2.   The fact that the claim in this case involves tip-producing
deliveries does not impact the determination about the class of
workers involved. .................................................................. 31

    D.    Amazon Flex drivers' tip-producing work is engagement in interstate
commerce. ........................................................................... 36

E. At a minimum, the Court should order discovery on the scope of work performed by the Amazon Flex delivery drivers at issue in this case.38

II. PLAINTIFFS' CLAIMS CANNOT BE COMPELLED TO ARBITRATION UNDER STATE LAW. ............................................................... 40

 A. Plaintiffs cannot be compelled to arbitrate their claims under the 2016 TOS. ...................................................................................... 40

  1. Federal law applies to the arbitration provision in the 2016 TOS, and the arbitration provision is not enforceable under federal law…. ......................................................................... 40

  2. The arbitration provision in the 2016 TOS is not enforceable under Washington law. .............................................................. 44

  3. The arbitration provision in the 2016 TOS is not enforceable under other states' laws. ........................................................... 47

 B. The arbitration provision in the 2019 TOS does not apply. ............... 50

 C. The arbitration provision in the 2021 TOS does not apply. ............... 54

CONCLUSION ................................................................................................. 55

CERTIFICATE OF SERVICE ......................................................................... 57

CERTIFICATE OF COMPLIANCE FOR BRIEFS ........................................ 58

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Fred Lind Manor*,

153 Wash. 2d 331 (2004) ........................................................................ 45

*Ajemian v. Yahoo!, Inc.,*

987 N.E.2d 604 (Mass. App. Ct. 2013) ............................................... 54

*AT&T Mobility LLC v. Concepcion*,

563 U.S. 333 (2011) ........................................................................... 45

*Atwood v. Rent-A-Ctr. E., Inc.,*

2016 WL 2766656 (S.D. Ill. May 13, 2016) ...................................... 48

*Baltimore & Ohio Southwestern Railway Co. v. Burtch,*

263 U.S. 540 (1924) ........................................................................... 24

*Circuit City Stores, Inc. v. Adams,*

532 U.S. 105 (2001) ...................................................................... 20, 23

*Coneff v. AT & T Corp.,*

673 F.3d 1155 (9th Cir. 2012) ............................................................ 45

*Diamond Match Co. v. Village of Ontonagon,*

188 U.S. 82 (1903) ............................................................................. 22

*Eagle v. Fred Martin Motor Co.,*

809 N.E.2d 1161 (Ohio App. Ct. 2004) ............................................. 49

*Eastus v. ISS Facility Services, Inc.,*

960 F.3d 207 (5th Cir. 2020) .................................................... 9, 13, 29

*Erie R. Co. v. Shuart,*

250 U.S. 465 (1919) .................................................................. 9, 14, 25

*Gabelli v. S.E.C.,*

568 U.S. 442 (2013) ........................................................................... 50

*Guidice v. Sage Corp,*

2006 WL 8433427 (S.D. Fla. Nov. 6, 2006) ...................................... 48

*Harper v. Amazon.com Services, Inc,*
  12 F.4th 287 (3d Cir. 2021) ................................................ 42

*In re DirecTV Early Cancellation Litig.,*
  738 F. Supp. 2d 1062 (C.D. Cal. 2010) .............................. 47

*In re Grice,*
  974 F.3d 950 (9th Cir. 2020) .............................................. 19

*Interstate Com. Comm'n v. Detroit, G.H. & M. Ry. Co.,*
  167 U.S. 633 (1897) ........................................................... 23

*Kinkel v. Cingular Wireless, L.L.C.,*
  223 Ill.2d 1, 47, 857 N.E.2d 250 (2006) ........................... 48

*Kwan v. Clearwire Corp.,*
  2012 WL 32380 (W.D. Wa. Jan. 3, 2012) ......................... 54

*Maldonado v. Sys. Servs. Of Am., Inc.,*
  2009 WL 10675793 (C.D. Cal. June 18, 2009) .................. 48

*Mason v. Uber Techs., Inc.,*
  2021 WL 5742563 (E.D. Pa. Dec. 2, 2021) ....................... 49

*McKee v. AT&T Corp.,*
  164 Wash. 372, 191 P.3d 845 (2008) ........................... 41, 46

*New Prime, Inc. v. Oliveira,*
  139 S. Ct. 532 (2019) ......................................................... 36

*Oliveira v. New Prime, Inc.,*
  857 F.3d 7 (1st Cir. 2017) .................................................. 42

*Palcko v. Airborne Express, Inc.,*
  372 F.3d 588 (3d Cir. 2004) .......................................... 34, 46

*Parker v. New Prime, Inc.,*
  2020 WL 6143596 (C.D. Cal. June 9, 2020) ..................... 48

*People of State of New York ex rel. Pennsylvania R. Co. v. Knight,*
  192 U.S. 21 (1904) ............................................................. 23

*Philadelphia & Reading Railway Co. v. Hancock,*

253 U.S. 284 (1920) ..................................................................... 26, 27

Powertel, Inc. v. Bexley,
   743 So. 2d 570 (Fla. Dist. Ct. App. 1999)........................................ 48

Rittmann v. Amazon.com, Inc.,
   971 F.3d 904 (9th Cir. 2020), cert. denied, 209 L. Ed. 2d 121, 141 S. Ct. 1374
   (2021) ................................................................................ passim

Romero v. Watkins & Shepard Trucking, Inc.,
   2021 WL 3675074 (9th Cir. Aug. 19, 2021)................................. 41, 42

Sanchez v. Valencia Holding Co., LLC,
   353 P.3d 741 (9th Cir. 2015)........................................................ 48

Saxon v. Southwest Airlines, Inc.,
   993 F.3d 492 (7th Cir. 2021)................................................... 29, 42

Schmidt v. Samsung Elecs. Am., Inc.,
   2017 WL 2289035 ...................................................................... 47

Scott v. Cingular Wireless,
   160 Wash. 2d 843 (2007) ............................................................ 45

Singh v. Uber Technologies, Inc.,
   939 F.3d 210 (3d Cir. 2019)......................................................... 39

Southwest Airlines, Inc. v. Saxon,
   142 S. Ct. 1783 (2022) .......................................................... passim

Specht v. Netscape Comm'ns Corp.,
   306 F.3d 17 (2d Cir. 2002)........................................................... 54

Thibodeau v. Comcast Corp.,
   912 A.2d 874 (2006) ................................................................... 49

Tillman v. Com. Credit Loans, Inc.,
   362 N.C. 93, 108, 655 S.E.2d 362, 373 (2008) ............................... 49

U.S. v. Lindsay,
   346 U.S. 568 (1954) ................................................................... 50

W.L. Byers Trucking, Inc. v. Falcon Transp. Co.,

2010 WL 3724895 (N.D. Ind. Sept. 17, 2010) ................................................... 49

*Waithaka v. Amazon.com, Inc.,*

   966 F.3d 10 (1st Cir. 2020) ........................................................... 45, 48

*Wallace v. GrubHub Holdings,*

   Inc., 970 F.3d 798 (7th Cir. 2020) ................................................. 21, 37

*Wallace v. Kato,*

   549 U.S. 384 (2007) ........................................................................ 50

*Whitney v. Alltel Commc'ns, Inc.,*

   173 S.W.3d 300 (Mo. Ct. App. 2005) ............................................ 48

**Statutes**

29 U.S.C. § 213 ............................................................................................ 33

9 U.S.C. § 1 .......................................................................................... passim

Mo. Stat. § 435.350 ..................................................................................... 49

**Other Authorities**

Restatement (Second) of Conflict of Laws, § 188 (1971) ....................................... 44

Sarah Perez, "Amazon Restaurants in US is Shutting Down," TechCrunch.com, at

   https://techcrunch.com/2019/06/11/amazon-restaurants-in-u-s-is-shutting-down/
   (June 11, 2019) ................................................................................... 38

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellees agree with Defendants-Appellants' jurisdictional statement.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court correctly held that the plaintiff Amazon Flex drivers are within a "class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, such that they are exempt from the Federal Arbitration Act?

2.     Whether the District Court correctly held that Plaintiffs could not be compelled to arbitrate their claims under state law, where Defendants had explicitly chosen to have only federal law apply to their arbitration provision and where there are no state laws applicable and/or under which Plaintiffs could be compelled to arbitration?

## STATEMENT OF THE CASE

Plaintiffs have worked as Amazon Flex delivery drivers, and they have brought this case on behalf of themselves and other similarly situated Amazon Flex drivers, alleging that Amazon has violated the Washington Consumer Protection Act by not distributing the full proceeds of customers' tips to the drivers. 2d Am.

Compl. ¶ 1 (ER-174).[1]  Plaintiffs have alternatively brought classwide claims

under the laws of the states in which they performed delivery services for Amazon.

*Id*., ¶ 2 (ER-175-177). Plaintiffs allege that Amazon has retained portions of the

tips that customers pay to the drivers, despite representing to both customers and

drivers that 100% of customer tips are paid to the drivers. *Id*., ¶¶ 27-33 (ER-180).

As stated in the Second Amended Complaint, customers may add tips for the

Amazon Flex drivers "[o]n some transactions through Amazon Flex." *Id*., ¶ 26

(ER-180).

Amazon Flex drivers perform some deliveries that are not tip-eligible,

specifically last-mile deliveries of items that customers order through Amazon's

website, which are shipped to an Amazon warehouse and then delivered to the

customers by Amazon Flex drivers. *See* Pls.' Decls. (ER-51-76). Amazon Flex

drivers may also perform some tip-eligible deliveries. *Id*. These deliveries include

Amazon Fresh and Whole Foods grocery deliveries, some warehouse items that are

ordered and delivered with a quick turnaround, and, for a brief period of time,

occasional restaurant deliveries. *Id*.

Plaintiffs all worked as Amazon Flex delivery drivers. 2d Am. Compl. ¶¶ 6-

19 (ER-178-179). Seven of the named plaintiffs submitted declarations describing

---

[1]    "ER-[page number]" refers to Appellants; Excerpts of Record Volume 1 of
1, Dkt. Entry 9.

their work as Amazon Flex drivers. Several plaintiffs spent much of their time (often several years) "exclusively deliver[ing] packages that I would pick up from one of Amazon's warehouses," containing "items that people bought on the Amazon website, like clothing, electronics, household goods, books, etc." Miller Decl. ¶ 5 (ER-53), Gleese Decl. ¶ 5 (ER-57); *see also* Sullivan Decl. ¶ 5 (ER-69).

Plaintiffs further testified that, at some point, they began making grocery deliveries for "Amazon Fresh." Miller Decl. ¶ 6 (ER-53); Gleese Decl. ¶ 6 (ER-57); Sullivan Decl. ¶ 7 (ER-69). At that point, they would "do both Amazon Fresh and 'regular' Amazon Flex package deliveries as needed. I never did exclusively one or the other." Miller Decl. ¶ 7 (ER-53); Gleese Decl. ¶ 7 (ER-57); Sullivan Decl. ¶ 8 (ER-69); *see also* Lawson Decl. ¶ 5 (ER-61) (delivered Amazon packages ordered on the website and Amazon Fresh groceries); Bocoum Decl. ¶ 5 (ER-65) (same); Paschal Decl. ¶ 5 (ER-73) (same). One of the plaintiffs started out doing Amazon Fresh deliveries and then switched to only "delivering 'regular' Amazon Flex packages. . ." Kimmey Decl. ¶¶ 5-6 (ER-77). The Amazon Fresh deliveries were tipped; the regular Amazon package deliveries were not. Miller Decl. ¶ 9; (ER-53) Gleese Decl. ¶ 9 (ER-57); Sullivan Decl. ¶ 10 (ER-69); Lawson Decl. ¶ 8 (ER-61); Bocoum Decl. ¶ 8 (ER-65); Kimmey Decl. ¶ 10 (ER-77).

Plaintiffs typically retrieved both their Amazon regular packages and their Amazon Fresh grocery items from Amazon warehouses. Miller Decl. ¶ 8 (ER-53);

Gleese Decl. ¶ 8 (ER-57); Sullivan Decl. ¶ 9 (ER-69); Lawson Decl. ¶¶ 6-7 (ER-61); Bocoum Decl. ¶¶ 6-7 (ER-65); Paschal Decl. ¶¶ 6-7 (ER-73); Kimmey Decl. ¶¶ 7-9 (ER-77).

A few of the plaintiffs did food delivery from restaurants "on a couple of occasions" or "[f]or a short period of time," but the restaurant delivery service was discontinued soon after it started. Lawson Decl. ¶ 5 (ER-61); Bocoum Decl. ¶ 5 (ER-65); Paschal Decl. ¶ 5 (ER-73).

At least three Plaintiffs brought goods across state lines as Amazon Flex delivery drivers. Plaintiff Miller delivered packages in Massachusetts and New Hampshire; Plaintiff Gleese did deliveries in Missouri and Kansas; and Plaintiff Paschal performed Amazon Flex deliveries in Illinois and Indiana. Miller Decl. ¶¶ 10-13 (ER-53-54); Gleese Decl. ¶ 10 (ER-57-58); Paschal Decl. ¶ 9 (ER-73).

## SUMMARY OF ARGUMENT

Under the Supreme Court's recent decision in *Southwest Airlines, Inc. v. Saxon*, 142 S. Ct. 1783 (2022), Plaintiffs in this case are part of a "class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, and are therefore exempt from the FAA. Just as the cargo loaders in *Saxon* handled goods that were in progress on their journey in foreign or interstate commerce and were therefore subject to the FAA's § 1 exemption even though they themselves did not cross state lines, so too do Amazon Flex delivery drivers handle goods as part of the

4

goods' journey across state lines from origin to destination when they perform last-mile deliveries of packages ordered from Amazon's website. This Court properly held that Amazon Flex drivers (the exact class of workers at issue here) were exempt from the FAA in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 121, 141 S. Ct. 1374 (2021), and that decision is good law after *Saxon* and, indeed, is bolstered by the Supreme Court's decision in *Saxon*. Defendants are wrong that *Saxon* precluded consideration of what the company does in determining whether workers are engaged in foreign or interstate commerce; the Court did just that in *Saxon*, where it held that the Southwest Airlines' cargo workers were engaged in interstate commerce precisely because Southwest Airlines moves cargo across state lines (even though the workers themselves perform all their cargo handling at the airport).

Here, the record is clear that Plaintiffs perform last-mile package delivery to customers, just like the plaintiffs in *Rittmann* and much like the cargo loading in *Saxon*. As such, they are engaged in foreign or interstate commerce. The fact that the claims in this case concern Plaintiffs' tip-producing deliveries does not change the "class of workers" to which they belong under § 1 of the FAA. Moreover, their tip-producing deliveries also constitute work in interstate commerce because they involve picking up packages from Amazon's warehouses (that originated from out of state) and delivering them to customers.

Because Plaintiffs are exempt from the FAA, they cannot be compelled to arbitrate their claims. This is because Amazon's contract containing the applicable arbitration provision (the 2016 Terms of Service (TOS)) states that the law applicable to the arbitration provision is federal law, and, under federal law, Plaintiffs are not required to arbitrate their claims. State law does not apply to the arbitration provision by the contract's clear language, as this Court held in *Rittmann*, analyzing the same exact contract.

If any state's law were to apply, it would be Washington's, as it is the state with the most significant relationship to the claims in the case (as Amazon conceded before the District Court and in *Rittmann*). Under Washington law, Amazon's arbitration provision cannot be enforced; it is unconscionable because it contains a class arbitration waiver which contravenes Washington public policy by interfering with individuals' efforts to vindicate their consumer rights and the rights of similarly situated individuals. Similarly, under the laws of nine of the other states in which Plaintiffs performed delivery services for Amazon, the arbitration provision cannot be enforced for the same reason.

The arbitration provision in the 2016 TOS is the one that applies here. It contains a provision preventing it from being modified for claims such as the ones in this case, that accrued before any subsequent versions of the TOS were

6

implemented. As such, the arbitration provisions in the 2019 TOS and 2021 TOS are not applicable to this case.

Plaintiffs' claims are not subject to arbitration; this Court should affirm the District Court's decision denying Amazon's motion to compel arbitration.

## ARGUMENT

**I.** **PLAINTIFFS IN THIS CASE ARE PART OF A "CLASS OF WORKERS" EXEMPT FROM THE FEDERAL ARBITRATION ACT.**

    **A.** **The Supreme Court's decision in *Saxon* confirms that the FAA does not apply to Plaintiffs' claims.**

        **1.** **Under *Saxon*, workers who handle goods bound for or coming from out of state are workers in interstate commerce.**

Since this Court's decision in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), the Supreme Court has similarly held that airline ramp agents who handle airplane cargo constitute a "class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, such that they are exempt from the Federal Arbitration Act (FAA). *Southwest Airlines, Inc. v. Saxon*, 142 S. Ct. 1783 (2022). This is so because ramp agents handle cargo as part of its journey in foreign or interstate commerce, even though the ramp agents themselves do not travel across state lines (and, indeed, do not travel more than a matter of several feet with the cargo, all within the airport). *Id*. at 1793. Under *Saxon*, Amazon Flex delivery drivers, who

deliver packages to customers that originated from out of state as part of those packages' journey in foreign or interstate commerce, are similarly a "class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, and Plaintiffs cannot be required to arbitrate their claims in this case.

Contrary to Amazon's arguments, *Saxon* affirms this Court's decision in *Rittmann* and confirms that Amazon Flex drivers are workers in interstate commerce. In *Saxon*, the Court established a two-part test for determining whether the FAA's transportation worker exemption applies. First, the Court must define "the relevant 'class of workers' to which" the plaintiffs belong. *Id*. (quoting 9 U.S.C. § 1). Second, the Court must "determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id*.

In defining the class of workers, the Court emphasized the actual work "that the members of the class, as a whole, typically carry out." 142 S. Ct. at 1788. In *Saxon*, because the plaintiff "frequently loads and unload cargo," she was part of a "class of workers" who load and unload cargo, even though her primary job was to "train and supervise teams of ramp agents." *Id*. at 1787.

As to engagement in foreign or interstate commerce, the Court held that cargo loaders play a direct and necessary role in the free flow of goods, even though they do not actually move goods across borders. The Court explained that loading cargo onto a "plane bound for interstate transit is intimately involved with

the commerce (*e.g.,* transportation) of that cargo," and "'[interstate] transportation [is] still in progress.'" 142 S. Ct. at 1790 (quoting *Erie R. Co. v. Shuart*, 250 U.S. 465, 468 (1919)). As such, cargo loaders constitute a class of workers "'engaged in foreign or interstate commerce.'" *Id*. at 1789 (quoting 9 U.S.C. § 1).

The Supreme Court's decision in *Saxon* abrogated a contrary decision by the Fifth Circuit, *Eastus v. ISS Facility Services, Inc.*, 960 F.3d 207 (5th Cir. 2020). *See Saxon*, 142 S. Ct. at 1788 (Court granted certiorari to "resolve the disagreement" between *Saxon* and *Eastus*). The *Saxon* holding also applies to *Eastus*, in which the plaintiff "primarily 'supervised 25 part-time and 2 full-time ticketing and gate agents' at the George Bush Intercontinental Airport in Houston, Texas," and "[a]s needed, Eastus would herself handle passengers' luggage." *Eastus*, 960 F.3d at 208. In other words, Eastus, who primarily supervised other ramp agents and only handled luggage herself "[a]s needed," *id*., is also part of a class of workers engaged in foreign or interstate commerce.

Defendants' characterization of *Saxon* is unavailing. First, Amazon states that "[t]he Supreme Court rejected the plaintiff's approach and adopted Southwest's based on the wording of Section 1." Defs.' Br. at 20. Not so; the Court clearly and repeatedly stated that it would adopt neither party's approach—"While Saxon defines the relevant class of workers too broadly, Southwest construes § 1's catchall category. . . too narrowly." 142 S. Ct. at 1791. Specifically, the Court

9

declined to adopt the plaintiffs' position that everyone who works at Southwest Airlines, including "shift schedulers [and] those who design Southwest's website," is within a class of workers engaged in foreign in interstate commerce. 142 S. Ct. at 1791. The Court also rejected Southwest's limiting interpretation that only those who physically move goods across borders should qualify. *Id*.

The Court also rejected Southwest's efforts to analogize cargo loading and unloading to other activities that the Court had previously held to lack the necessary nexus to interstate commerce, because those cases "all addressed activities far more removed from interstate commerce than physically loading cargo directly on and off an airplane headed out of State." 142 S. Ct. at 1792. Specifically, the cases cited by Southwest involved "those who sell asphalt for intrastate construction [and] those who clean up after corporate employees." *Id*. In contrast, "airplane cargo loaders . . . handle goods traveling in interstate and foreign commerce," even though they themselves do not actually travel interstate. *Id*.

Amazon repeatedly argues that the Court in *Saxon* held that the class of workers is to be determined based on the workers' conduct, rather than based on the conduct of the employer, and Amazon argues that the District Court therefore erred in failing to consider the work actually performed by Plaintiffs. *See* Defs.' Br. at 19-20. Amazon's argument is wrong on both counts—it is not true that the

10

Supreme Court omitted all consideration of what the company does, and it is also not true that the District Court did not consider the work performed by the drivers.

The Court observed in *Saxon*: "Southwest Airlines moves a lot of cargo. In 2019, Southwest carried the baggage of over 162 million passengers to domestic and international destinations." 142 S. Ct. at 1787. It went on to note that, "[t]o move that cargo, Southwest employs 'ramp agents,' who physically load and unload baggage, airmail, and freight." *Id*. Contrary to Amazon's assertion, the fact that the cargo handled by the ramp agents goes on to fly on airplanes out of state and out of the country (which it only does because of ***Southwest Airlines'*** business) ***is*** integral to the Court's conclusion in *Saxon*. *See, e.g.*, 142 S. Ct. at 1789, 1790 (cargo loading occurs onto and off of "planes traveling in interstate commerce," "plane bound for interstate transit").[2]  Accordingly, Amazon's repeated refrain that *Saxon* instructed courts to ignore the business of the company at issue in determining whether workers were engaged in foreign or interstate commerce is just wrong.

Second, Amazon is incorrect that the District Court did not consider the actual work performed by Amazon Flex drivers. Instead, because Amazon's

---

[2]     In distinguishing two cases in which the Court had previously held that work performed was too distant from interstate commerce, the Court explained in *Saxon* that, "[i]n each case,  . . . the relevant ***firm*** was not 'engaged in' interstate commerce. . ." 142 S. Ct. at 1792 (emphasis added).

contract envisioned that Amazon Flex drivers would be able to perform both last-mile deliveries and tip-producing deliveries, the District Court held that all of that work was relevant to determining the class of workers at issue. The Supreme Court endorsed this approach in *Saxon*, noting that the language used in § 1 "emphasizes the actual work that the members of the class, ***as a whole***, typically carry out." 142 S. Ct. at 1788 (emphasis added).

### 2. The class of workers at issue in this case is Amazon Flex delivery drivers.

Applying *Saxon*'s two-part test here, the "class of workers" at issue here is Amazon Flex delivery drivers, who regularly deliver packages ordered by customers from Amazon's website and which the drivers pick up from an Amazon warehouse and deliver to the customer. This conclusion is supported by the record evidence, which confirms that the named plaintiffs are all Amazon Flex delivery drivers who have regularly performed last-mile package delivery. *See* Stmt. of the Case. Moreover, at least three of the named plaintiffs did package deliveries for Amazon across state lines. *Id*. Additionally, as the District Court observed, Plaintiffs are performing deliveries under Amazon's contract for Amazon Flex delivery drivers, which includes last-mile package delivery. Dist. Ct. Ord. at 7 (ER-10).

This record more than suffices to conclude that Plaintiffs "frequently" do last-mile package deliveries, *Saxon*, 142 S. Ct. at 1787, just like the plaintiffs in

12

*Rittmann* (who held the same position). *See* Section I.B, *infra*, for further discussion of *Rittmann*. The fact that they may also perform tip-producing deliveries does not change the fact that they are part of that class of workers. This is similar to *Saxon*, in which the plaintiff's primary responsibility was training and supervision, but she was nevertheless part of the class of workers who loaded and unloaded cargo. 142 S. Ct. at 1787. So too *Eastus*, where, "[a]s needed, Eastus would herself handle passengers' luggage," 960 F.3d at 208, which sufficed to place her in a class of workers engaged in foreign or interstate commerce.

Amazon ignores the Supreme Court's instruction to look at what the workers "frequently" do and urges the Court to conclude that "the appropriately defined class of workers here is local delivery drivers." Defs.' Br. at 21. That conclusion is not supported by the record, which establishes that Plaintiffs regularly engaged in last-mile delivery of packages ordered by customers from Amazon's website and coming from out of state. Nor is it supported by *Saxon*; the plaintiffs in *Saxon* and *Eastus*, whose primary job duties were undisputedly supervision, not the actual loading and unloading of cargo, but the "frequent[]" cargo loading in *Saxon* and the "[a]s needed" cargo loading in *Eastus* sufficed for them to be part of a class of workers who performed cargo loading. *Saxon*, 142 S. Ct. at 1787; *Eastus*, 960 F.3d at 208. So too does the record here suffice to establish frequent last-mile package deliveries by Plaintiffs and other Amazon Flex drivers.

### 3. Amazon Flex delivery drivers are engaged in foreign or interstate commerce.

Amazon Flex delivery drivers "frequently" "handle goods traveling in interstate and foreign commerce," just like the cargo loaders in *Saxon*. 142 S. Ct. at 1792. As in *Saxon*, Amazon Flex delivery drivers take packages that have been transported in foreign or interstate commerce and deliver them to the customers as part of their continuous journey from origin to destination. The "'[interstate] transportation [is] still in progress'" as Amazon Flex delivery drivers take the packages to their final destination. 142 S. Ct. at 1790 (quoting *Erie R. Co.*, 250 U.S. at 468). As such, they are engaged in foreign or interstate commerce.

Amazon claims that the District Court "improperly extended the exemption to classes of workers 'engaged in work affecting commerce.'" Defs.' Br. at 22. In fact, the District Court's decision is on all fours with *Saxon*. The court looked at whether the employees had interstate commerce as a "central part" of their job description, as opposed to being only "'tangentially related' to their responsibilities." Dist. Ct. Ord. at 6 (ER-9). Similarly, in *Saxon*, the Court held that the employees' work must be "directly involved in transporting goods across state or international borders" but explicitly rejected Southwest's argument that "only workers who physically move goods or people across foreign or inter[state] boundaries" should be included. 142 S. Ct. at 1789, 1791.

14

As in *Saxon*, Plaintiffs are part of a class of workers engaged in foreign or interstate commerce because their frequent delivery of goods to customers ordered and hailing from out of state constitutes "direct involve[ment] in transporting goods across state or international borders." 142 S. Ct. at 1789.

**B.** **Under this Court's decision in Rittmann, Plaintiffs are part of a class of workers engaged in foreign or interstate commerce and are subject to the § 1 exemption to the FAA.**

Contrary to Amazon's argument, this Court's decision in *Rittmann* unquestionably survives *Saxon* and applies to the class of workers in this case. In *Rittmann*, this Court held that Amazon Flex drivers are workers in interstate commerce to whom § 1's exemption to the FAA applies. The Court described Amazon Flex drivers' job responsibilities as follows:

> In the AmFlex program, Amazon contracts with individuals to make "last mile" deliveries of products from Amazon warehouses to the products' destinations using the AmFlex smart phone application. AmFlex participants use a personal vehicle or bicycle, or public transportation, to deliver products ordered through the Amazon website or mobile applications. They pick up assigned packages from an Amazon warehouse and drive an assigned route to deliver the packages. AmFlex delivery providers occasionally cross state lines to make deliveries, but most of their deliveries take place intrastate. At the end of each shift, the delivery providers return undelivered packages to Amazon's warehouses.

971 F.3d at 907. The record here establishes identical facts: Plaintiffs used their personal vehicles to deliver products ordered through the Amazon website or mobile applications; they picked those packages up from an Amazon warehouse

15

and drove assigned routes to deliver the packages; they occasionally crossed state lines; and they returned undelivered packages to the Amazon warehouse at the end of their shifts. *See* Pls.' Decls. (ER-51-78).

In *Rittmann*, this Court rejected the same argument rejected by the Supreme Court in *Saxon*. The Court held: "Amazon's position rests on the notion that transportation workers must actually cross state lines to be 'engaged in interstate commerce' for the exemption to apply. We reject that construction of that statute." 971 F.3d at 909. That is precisely the argument advanced by Southwest Airlines and rejected by the Supreme Court in *Saxon*. 142 S. Ct. at 1791.

As in *Saxon*, the Court in *Rittmann* drew a distinction between workers who do not cross state lines but are engaged in the movement of goods in interstate commerce and those workers whose jobs are only "tangentially related" to interstate commerce. 971 F.3d at 911. The Court observed that a customer service representative for transportation carrier and an account manager who occasionally made out-of-state deliveries are not workers engaged in interstate commerce. *Id*. In contrast, Amazon Flex drivers "pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination. . . [T]he Amazon packages they carry are goods that remain in the stream of interstate commerce until they are delivered." *Id*. at 915.

Amazon's arguments that *Saxon* somehow overrules *Rittmann* are without merit. Amazon characterizes *Rittmann* as "violat[ing] *Saxon*'s instructions to focus on the workers' own activities, rather than the activities of the business for which they work." Defs.' Br. at 30. But Amazon has mischaracterized *Saxon*—the Court's point there was that workers do not fit within § 1's exemption just because they work for an airline. Nor is that what *Rittmann* holds. *Rittmann*, for example, does not stand for the proposition that Amazon "shift schedulers or those who design [Amazon's] website]" are within the § 1 exemption. *Saxon*, 142 S. Ct. at 1791.

Instead, as in *Saxon*, *Rittmann* held that "'a class of workers must themselves be 'engaged *in the channels* of foreign or interstate commerce.'" 971 F.3d at 916-17 (emphasis in original). The Court concluded that, because "AmFlex workers complete the delivery of goods that Amazon ships across state lines and for which Amazon hires AmFlex workers to complete the delivery[,] AmFlex workers form a part of the channels of interstate commerce, and are thus engaged in interstate commerce as we understand that term." *Id*. at 917. That is *precisely* the analysis employed by the Supreme Court in *Saxon*. Specifically, the Court held that, as the workers loading and unloading cargo on airplanes bound to go out of state and/or out of the country, cargo loaders are "intimately involved with the commerce (e.g., transportation) of that cargo." *Saxon*, 142 S. Ct. at 1791. This is

17

because "'there could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate commerce." *Id.* at 1790. This is exactly like the situation in *Rittmann* and in this case.

Amazon claims that *Rittmann* improperly focused on where the packages delivered by Amazon Flex workers were coming from and that, instead, the focus should be solely on what the workers themselves do, purportedly as "*Saxon* instructs." Defs.' Br. at 31. But that is incorrect. As in this case and *Rittmann*, the workers in *Saxon* do not themselves move goods across state or foreign borders. They "physically load and unload cargo on and off airplanes." 142 S. Ct. at 1789. Under Amazon's interpretation, "there is no meaningful difference" between this work and loading and unloading cargo from vehicles that stay intrastate. Defs.' Br. at 31. However, because **Southwest Airlines** moves that cargo in foreign and interstate commerce, the ramp agents' work is "part of the interstate transportation of goods." 142 S. Ct. at 1789. Under *Saxon*, one must look at where the goods eventually go (because of the company's business) in order to determine if the § 1 exemption applies, and Amazon's argument to the contrary is simply incorrect.

In attempting to bolster its argument that the company's business is irrelevant, Amazon takes out of context this Court's statement in *In re Grice*

regarding "the interstate nature of an employer's business," arguing that that statement somehow shows that this Court's jurisprudence is out of step with *Saxon*. Defs.' Br. at 30 (quoting *In re Grice*, 974 F.3d 950, 957 (9th Cir. 2020)). The point in looking at the nature of the employer's business (in *Grice*, *Rittmann*, and *Saxon*) is to analyze whether the items being transported (passengers in *Grice*, goods in *Rittmann*, and airplane cargo in *Saxon*) come from or go out of state. So, whether or not the items actually move in interstate commerce (for which the workers' role is part of that journey) is the "critical factor" referenced in *Grice*. 974 F.3d at 957.

Amazon is also incorrect that last leg deliveries are somehow not sufficiently involved in interstate commerce under *Saxon*. Amazon characterizes *Rittmann* as establishing a "'flow of interstate commerce' standard," which it claims was "outright rejected" in *Saxon*. Defs.' Br. at 32. Neither point is correct. First, *Rittmann* cannot be said to have applied a "flow of interstate commerce standard." Instead, the Court simply held that Amazon Flex workers deliver packages that come from out of state and, as such, they are "transportation workers engaged in the movement of interstate commerce and exempt from the FAA's application," "even if they do not cross state lines to make their deliveries." 971 F.3d at 915, 919.

Second, *Saxon* did not reject a "flow of interstate commerce standard." Early in the opinion, the Court discussed *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105

(2001), in which it had "indicated that any such exempted worker must at least play a direct and 'necessary role in the ***free flow of goods***' across borders" and observed that "[c]argo loaders exhibit this central feature of a transportation worker." *Saxon*, 142 S. Ct. at 1790 (quoting *Circuit City*, 532 U.S. at 121) (emphasis added). Moreover, in rejecting Southwest's argument that cargo loading was akin to other activities that the Court had found to be too tenuously connected to interstate commerce to qualify for the § 1 exemption (*i.e.*, "intrastate sales of asphalt" and "'localized [janitorial] services," 142 S. Ct. at 1792), the Court observed that "airplane cargo loaders plainly do perform 'activities within ***the flow of interstate commerce***' when they handle goods traveling in interstate and foreign commerce, either to load them for air travel or to unload them when they arrive." *Id*. (emphasis added). These statements from *Saxon* make clear that Amazon is simply wrong that "*Saxon* outright rejected this 'flow of interstate commerce' standard." Defs.' Br. at 32.

Amazon strains further in arguing that "[t]he Supreme Court expressly recognized . . . that the deliveries in *Rittmann* are 'further removed' from interstate commerce than the airplane loading and unloading in *Saxon*." Defs.' Br. at 33. The Court did nothing of the kind. Amazon bases this argument on a footnote in *Saxon* in which the Court noted: "the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate

20

commerce or the actual crossing of borders." 142 S. Ct. at 1789 n.2. In making this observation, the Court compared *Rittmann*, in which the workers' work was similar to that of the *Saxon* workers, with food delivery drivers in *Wallace v. GrubHub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020), who may be considered to be "further removed from the channels of interstate commerce." *Id*. Amazon's contrary interpretation ignores the language of the footnote and also ignores the similarity between loading cargo bound for interstate travel and delivering packages originating from out of state. It also makes no sense; *Rittmann* is good law, as is *Wallace* (and, indeed, the Court denied Amazon's petition for a writ of certiorari in *Rittmann*, 141 S. C.t 1374 (2021)), so Amazon's suggestion that the Court was implying that *Rittmann* was wrongly decided is baseless.

Amazon's effort to apply *Saxon* to "last leg deliveries" in a manner that is favorable to Amazon twists the *Saxon* Court's decision. Amazon claims that "[a]s a group, last leg delivery drivers transport goods that have already completed their journey across international or state borders" and that the cross-border transportation has already ended "without the Amazon Flex driver's involvement." Defs.' Br. at 34-35. That is ***identical*** to the situation in *Saxon*. Ramp agents move cargo in an airport, and they have no direct involvement in the interstate movement of that cargo before or after that point. If anything, Amazon Flex drivers are more integrally involved in interstate commerce as they actually move the goods in a

21

vehicle (sometimes across state lines), *see* Stmt. of the Case, whereas ramp agents simply carry cargo some number of feet within an airport (and the ticketing and gate agents at issue in *Eastus* simply tag luggage and load it on the conveyer belt). Like Amazon Flex drivers, ramp agents are not the employees flying the airplanes that move the cargo in interstate commerce. Nevertheless, the Court held that the ramp agents are directly involved in transporting goods across state or international borders, and the same reasoning applies as to Amazon Flex drivers.

Amazon's extensive discussion of pre-FAA case law, in which it attempts to make the points that: (1) those cases support its interpretation of what constitutes "engage[ment] in foreign or interstate commerce," as that phrase is used in 9 U.S.C. § 1; and (2) this Court erred in its interpretation of pre-FAA case law in *Rittmann*, Defs.' Br. at 35-36, is without merit. The cases cited by Amazon are easily distinguishable. They are all Commerce Clause cases, and they all involve situations in which there is a continuous interstate journey and then a ***separate*** intrastate transport, often after an indefinite delay. *See Diamond Match Co. v. Village of Ontonagon*, 188 U.S. 82, 96 (1903) (where lumber had been cut and prepared but was being held (often for months or years) until it could be utilized, "[t]he carrying of [the logs] in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey" in interstate commerce); *Interstate Com. Comm'n v. Detroit, G.H. & M. Ry. Co.*, 167 U.S. 633,

22

643 (1897) (complete journey on railway line, after which goods reach terminus and then may go on after the conclusion of their journey); *People of State of New York ex rel. Pennsylvania R. Co. v. Knight*, 192 U.S. 21, 28 (1904) (passenger interstate transit ends at train station, and cab rides from station to final destination are not part of interstate commerce).

The Supreme Court has not referred to its pre-FAA jurisprudence in determining the scope of the FAA's § 1 exemption (except in *Saxon*, as discussed below), and it certainly has not cited the cases on which Amazon relies. To the contrary, in *Circuit City*, the Court held that the phrase "engaged in foreign or interstate commerce" in § 1 was to be interpreted in light of the specific language used in that statute and without reference to more general jurisprudence relating to interstate commerce and the interpretation of the Commerce Clause. 532 U.S. at 118-19. It appears to be a theory of Amazon's own making (advanced in *Rittmann* and now here) that these pre-FAA Commerce Clause cases should bear on the interpretation of the FAA's § 1 exemption. Lacking any indication from the Supreme Court that these pre-FAA cases should have bearing on the interpretation of § 1, it makes perfect sense that this Court, in Amazon's words, "brushed aside the Supreme Court's differentiation between interstate and intrastate transit in *Knight* because it involved a legal question about taxation." Defs.' Br. at 36-37.

Amazon claims that "*Saxon* shows that pre-FAA cases are significant aids for deciding when particular transportation is, 'as a practical matter, part of the interstate transportation of goods.'" Defs.' Br. at 37 (quoting *Saxon*, 142 S. Ct. at 1789). But *Saxon* does not cite *Knight* or the other cases cited by Amazon. To the extent that it cites some pre-FAA case law, it is to demonstrate that interstate commerce ***does*** include the loading and unloading of goods coming from or traveling out of state. First, *Saxon* quotes *Baltimore & Ohio Southwestern Railway Co. v. Burtch*, 263 U.S. 540, 544 (1924), for the point that "[w]e have said that it is 'too plain to require discussion that the loading and unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it.'" 142 S. Ct. at 1789. This observation was made in *Burtch* in connection with the question of whether or not the plaintiff's claim was governed by the federal Employers' Liability Act, for which the central question is whether "'the employee at the time of the injury [was] engaged in interstate transportation, or in work so closely related to it as to be practically a part of it.'" *Burtch*, 263 U.S. at 543. This standard is clearly analogous to the question at issue in applying the FAA's § 1 exemption.

Similarly, *Erie Railway Co. v. Shuart*, cited in *Saxon*, 142 S. Ct. at 1790, considered the question of what constituted work occurring "from beginning to end of the transportation contracted for" for purposes of assessing liability for an

accident. 250 U.S. 465, 467 (1919). In *Erie*, animals "were awaiting removal from the [railway] car through a cattle chute alleged to be owned, operated and controlled by the railroad," and as such, "[i]f [the railroad's] employees had then been doing the work of unloading there could be no doubt that transportation was still in progress" and "interstate movement" had not ended." *Id*. at 468. *Saxon* cited *Erie* in support of its conclusion that cargo loaders are transportation workers despite not actually moving goods across state lines themselves. 142 S. Ct. at 1790.

Amazon's reference to *Saxon*'s citations to *Burtch* and *Erie* does not support its point for at least three reasons. First, these cases deal with an issue more closely aligned with the application of the § 1 exemption than the question in the cases cited by Amazon.[3]  Second, in both of the cases cited in *Saxon*, the conclusion was that the work in question ***was*** work in interstate commerce, even though it did not involve the crossing of state borders. Third, the facts in *Burtch* and *Erie* are analogous to this case. In both cases, the workers in question were unloading goods that had come from out of state. Amazon Flex drivers are even more actively engaged in the movement of interstate goods. As such, *Saxon*'s citation to these

---

[3]     All of the cases cited by Amazon concern the business of a company and do not look at what the workers themselves do, whereas *Burtch* and *Erie* focus on what the workers do. In this way, Amazon's argument about the pre-FAA cases is in direct conflict with its repeated argument that the Court should look only at what the workers do, not what the company does.

cases supports the conclusion that Amazon Flex drivers are subject to the § 1 exemption.

Amazon's discussion of a 1920 Supreme Court case cited in *Rittmann* is misleading as well. First, Amazon claims that *Rittmann* "highlighted" *Philadelphia & Reading Railway Co. v. Hancock*, 253 U.S. 284 (1920). Defs.' Br. at 37. *Rittmann* did nothing of the sort; it referenced *Hancock* twice but did not come close to "highlighting" it. 971 F.3d at 912, 917. Nevertheless, *Hancock* is comparable to this case and to *Saxon* (and to *Burtch* and *Erie*). There, the railroad worker was operating a train carrying coal and, while that train's transit was intrastate, "'the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state.'" *Rittmann*, 971 F.3d at 912 (quoting *Hancock*, 253 U.S. at 286). The *Rittmann* Court noted that *Hancock* "interpreted nearly identical language" and "consider[ed] the out-of-state nature of goods." 971 F.3d at 917. This is accurate; *Hancock* considered whether the worker was employed in interstate commerce when an accident occurred, for purposes of determining whether the Employer's Liability Act applied. 253 U.S. at 286.

Amazon attempts to distinguish *Hancock* because "[t]he coal remained in the same railcars throughout both phases of the journey." Defs.' Br. at 37. However, *Hancock* is not only analogous to both this case and *Saxon*, but nearly identical to the pre-FAA cases cited by the Supreme Court in *Saxon*, *Burtch* and

*Erie*. Indeed, one of those cases (*Burch*) also considered application of the Employer's Liability Act. Moreover, the fact that the coal in *Hancock* remained in the same railcars throughout its journey is akin to the cargo in *Saxon* staying in the same suitcase or the goods ordered by Amazon's customers remaining in the same "brown-box package[]," Defs.' Br. at 37; all journeys involve continuous transit from point A to point B, and the workers at issue participate in one leg of that journey. As the Court held in *Hancock*: "The coal was in the course of transportation to another state when the cars left the mine. There was no interruption of the movement; it always continued towards points as originally intended." 253 U.S. at 286.

To the extent they are relevant at all, pre-FAA cases support the conclusion that Amazon Flex drivers work in interstate commerce when they take packages ordered and shipped from other states to their final destination.

**C.    Like the plaintiffs in *Rittmann*, Plaintiffs and other Amazon Flex drivers perform last-mile deliveries and are engaged in interstate commerce, and the substance of the claims in the case does not change that.**

Though this case undisputedly concerns the same class of workers as *Rittmann* (Amazon Flex drivers), Amazon tries to distinguish the class of workers in two ways. First, it argues that the plaintiffs in this case may not have done the same deliveries as the plaintiffs in *Rittmann*. And second, it argues that the

substance of the claim in this case somehow impacts the articulation of the class of workers involved. Both arguments must fail.

1. **The evidence demonstrates that Plaintiffs performed last-mile deliveries, just like the Amazon Flex drivers in *Rittmann*.**

First, Amazon's argument about the deliveries performed by Plaintiffs as compared to the *Rittmann* plaintiffs is contradicted by the record. Essentially ignoring the record evidence of what Plaintiffs did in this case and also sidestepping the fact that it has access to definitive evidence about the deliveries Plaintiffs did, Amazon relies entirely on its claim that "Amazon Flex drivers can choose to perform tip-eligible GSF deliveries exclusively and . . . some have done so." Defs.' Br. at 25. Amazon's only effort to contest Plaintiffs' declarations is its assertion that Plaintiffs have not proven "that they all performed last leg deliveries of good that originated in other states" or that they did so frequently. *Id*.

Amazon's argument about the record evidence in this case must fail for at least three reasons. First, Plaintiffs continuously did deliveries of Amazon warehouse (non-tipped) packages and some of them "exclusively" did those deliveries for much of their time as an Amazon Flex driver. Miller Decl. ¶¶ 5-7 (ER-53); Gleese Decl. ¶ 5-7 (ER-57); Lawson Decl. ¶¶ 5, 8 (ER-61); Bocoum Decl. ¶¶ 5, 8 (ER-65); Sullivan Decl. ¶¶ 5, 8 (ER-69); Paschal Decl. ¶¶ 5-7 (ER-73); Kimmey Decl. ¶¶ 5-10 (ER-77). And three of the plaintiffs crossed state lines

themselves while delivering packages. Miller Decl. ¶¶ 10-13 (ER-53-54); Gleese Decl. ¶ 10 (ER-57-58); Paschal Decl. ¶ 9 (ER-73). Amazon does not contest this evidence, which more than suffices to show that Plaintiffs were regularly performing last-mile package delivery. Significantly, in *Saxon*, the Seventh Circuit held that an uncontested declaration from the named plaintiff sufficed to establish that she and other ramp supervisors handled cargo regularly: "Although this is officially the role of the ramp agents, not the supervisors, Saxon estimates that she and her peers each cover three full ramp-agent shifts per week. Southwest offered no evidence to contradict this evidence." 993 F.3d 492, 497 (7th Cir. 2021) (cited with approval at *Saxon*, 142 S. Ct. at 1788.) So too should Plaintiffs' declarations, all uncontested by Amazon, suffice to establish their work in interstate commerce.

Second, under *Saxon*, this unquestionably qualifies as sufficient work in interstate commerce, especially compared with ramp supervisors, whose primary duties are to "train and supervise teams of ramp agents," not to handle the cargo themselves. 142 S. Ct. at 1787. Plaintiffs' evidence demonstrates significantly more work in interstate commerce than *Eastus*, as well, in which the plaintiff only handled luggage "[a]s needed." 960 F.3d at 208.

Finally, the record evidence here is bolstered by this Court's conclusion about the nature of Amazon Flex drivers' work in *Rittmann*, as Amazon concedes

that the drivers here are eligible to perform the same work as the drivers in

*Rittmann*, under the same contract. As in *Rittmann*:

> There is no suggestion that the goods AmFlex workers deliver
> originate in the same state where deliveries take place, such that
> delivery providers are making purely intrastate deliveries. Rather,
> AmFlex workers pick up packages that have been distributed to
> Amazon warehouses, certainly across state lines, and transport them
> for the last leg of the shipment to their destination. . . [T]he Amazon
> packages they carry are goods that remain in the stream of interstate
> commerce until they are delivered.

971 F.3d at 915 (9th Cir. 2020).

Significantly, this Court recognized in *Rittmann* that Amazon Flex drivers

engaged in some local food delivery in addition to last-mile package delivery and

held that this fact did not negate the conclusion that they are workers engaged in

interstate commerce. Specifically, the Court held: "Setting aside whatever merits

of the dissent's discussion of jarred sauces and canned sodas, the fact remains that

AmFlex workers are engaged to deliver packages from out of state or out of the

country, even if they also deliver food from local restaurants. They are thus

engaged in interstate commerce, even if that engagement also involves intrastate

activities." 971 F.3d at 917 n.7.

*Saxon* confirmed that the *Rittmann* Court's interpretation was the correct

one. It is clear from *Saxon* that the standard is not a plaintiff's primary duty or job

title but whether they can be said to "[f]requently" engage in work related to

interstate commerce, even if their primary job responsibility is, for example, to

30

"train and supervise teams of ramp agents." 142 S. Ct. at 1787. If a ramp

supervisor in *Saxon* can be said to load and unload cargo "frequently," then

certainly Amazon Flex drivers who regularly performed last-mile deliveries fall

into the same class as those same exact workers in *Rittmann*.

> **2.** **The fact that the claim in this case involves tip-producing deliveries does not impact the determination about the class of workers involved.**

Second, there is no basis for Amazon's suggestion that the substance of the

claim affects the determination of what the workers do. Indeed, the language of § 1

itself makes this clear. It states, in relevant part: "nothing herein contained shall

apply to contracts of employment of . . . any . . . class of workers engaged in

foreign or interstate commerce." 9 U.S.C. § 1. The relevant question, therefore, is

the "class of workers," not the type of claims at issue. The Supreme Court has

repeatedly stated—most recently in *Saxon*—that the FAA must be interpreted in

accordance with its plain language. *See* 142 S. Ct. at 1788, 1792. Amazon's

interpretation would change the language of the FAA. However, "§ 1's plain text

suffices to show" that Plaintiffs are in the class of workers of last-mile delivery

drivers, and the Court has "no warrant to elevate vague invocations . . . over the

words Congress chose." *Id*. at 1792.

Applying § 1's plain language, *Saxon* focused on defining the "class of

workers" at issue, without any discussion of or reference to the underlying claim.

31

Similarly, the District Court properly held here that "the nature of the claims or controversies in a particular case is *not* relevant to ascertaining whether a claimant belongs to an exempt class of workers." Dist. Ct. Ord. at 6 (ER-9).

The conclusion that the nature of the claim has no bearing on the definition of the relevant "class of workers" is further supported by § 1's reference to "contracts of employment." 9 U.S.C. § 1. Section 1 does not focus on "claims" of classes of workers in interstate commerce but instead focuses on those workers' "contracts of employment." Amazon Flex drivers have one contract of employment which governs all of their work, including last-mile deliveries and their tip-producing deliveries. Dist. Ct. Ord. at 7 (ER-10). As the District Court properly observed: "Defining Amazon Flex drivers as a class of workers engaged only in local GSF deliveries, and thus not exempt from the FAA, would essentially be redrawing the contract to exclude drivers' exempt activities. If this were the result Amazon had wanted, it could easily have used two different contracts for its drivers—one for AMZL deliveries and one for GSF deliveries." Dist. Ct. Ord. at 9 (ER-11).

Amazon claims that "contracts of employment" in § 1 "simply means 'agreements to perform work,'" and because "Amazon Flex drivers can, and do, decide to perform only GSF delivery blocks," "GSF deliveries are a different engagement, for the exemption's purposes, than AZML deliveries." Defs.' Br. at

26-27. This argument is belied by the record evidence and contradicts *Saxon*. First, Plaintiffs here did perform last-mile deliveries and did so regularly. Second, under *Saxon*, it is improper to parse a worker's job duties so finely. The Court's ruling in *Saxon* (and its abrogation of *Eastus*) make clear that even workers whose job descriptions are primarily supervisory belong to a class of workers engaged in interstate commerce, as long as they do some handling of cargo bound for or coming from out of state.

Amazon cannot cite to a single case that redraws the definition of the "class of workers" involved based on the nature of the claim. Its only argument is that "prior cases do not reject such limitations." Defs.' Br. at 28. But implicitly they do. It is notable, for example, that the Supreme Court does not engage in any analysis or discussion of the claim in *Saxon* when defining the applicable class of workers. Moreover, while Amazon argues that the underlying legal controversy in *Saxon* "plainly encompasses the worker activities that supposedly qualify as interstate commerce," Defs.' Br. at 28, that is not true; *Saxon* concerned whether ramp supervisors had properly been classified as exempt from overtime under the FLSA, for which the salient issues have to do with how much management work those supervisors performed. *See, e.g.*, 29 U.S.C. § 213(a)(1) ("any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from

overtime). This is not the work that qualified them as within a class of workers engaged in foreign or interstate commerce.

Similarly, *Eastus* concerned the plaintiff's employment discrimination and retaliation claims, and her "[a]s needed" work handling luggage appears to have no bearing whatsoever on the claim, but this did not stop the Court from holding that she is subject to the § 1 exemption. *See Saxon*, 142 S. Ct. at 1788. Other cases similarly have considered the "class of workers" question without any evaluation of the underlying claim, including where the underlying claim appeared to have no relation to any work in interstate commerce. *See, e.g., Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 590 (3d Cir. 2004), cited in Dist. Ct. Ord. at 7 (ER-10) (plaintiff's claims under Title VII, relating to employer's failure to investigate and address that "other Airborne employees falsely accused her of sexual misconduct, verbally and physically intimidated her during work, created a hostile work environment through sexist remarks, spread offensive rumors about her sex life and moral character through Airborne's internal communications system, and generally discriminated against her because of her gender").

Amazon's last-ditch effort to rope in the nature of the claim as part of the "class of workers" analysis is its argument that "[o]ther provisions of the FAA . . . offer contextual support for taking account of the nature of the parties' underlying dispute." Defs.' Br. at 29. Specifically, Amazon makes the tenuous argument that,

because § 2 of the FAA discusses the controversies or issues to be arbitrated, "the nature of the controversy" should somehow be relevant in determining whether the class of workers at issue is covered by the FAA. This argument is meritless on its face. There is no basis for rewriting § 1's clear "class of workers" language based on procedural provisions in later sections of the FAA. "[Section] 1's plain text suffices to show," 142 S. Ct. at 1792, that the question as to applicability of the FAA is the "class of workers," 9 U.S.C. § 1, not "the nature of the controversy," Defs.' Br. at 29, as Amazon would prefer.

Amazon's reference to other provisions of the FAA does not support its argument, moreover, because § 1 explicitly states that "***nothing herein contained***" shall apply to the contracts of "any . . . class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added). In other words, the language in subsequent sections "herein" of the FAA cannot serve to limit or narrow the scope of the § 1 exemption.[4]

---

[4]    Curiously, Amazon cites *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532 (2019), ostensibly because that case "explain[s] the interrelationship between the exemption of Section 1 and the procedures of Sections 2, 3, and 4." Defs.' Br. at 29. But *Oliveira* further demonstrates the error of Amazon's argument. There, the Supreme Court stated that "§ 1 helps define § 2's terms," and "warns that 'nothing' in the Act 'shall apply' to 'contracts of . . . any . . . class of workers engaged in foreign or interstate commerce.'" 139 S. Ct. at 537. In other words, the "interrelationship" among the provisions is that § 2 and the other FAA provisions do not apply to transportation workers (as evidenced by the strong "nothing herein contained" language in 9 U.S.C. § 1), not the opposite proposition that Amazon is

The Supreme Court rejected a similar argument in *Saxon*, in which Southwest argued that the statutory purpose, demonstrated by § 2 of the FAA, "counsels in favor of an interpretation that errs on the side of fewer § 1 exemptions." 142 S. Ct. at 1792. The Court rejected this argument out of hand: "we are not 'free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal.'" *Id*. (quoting *New Prime*, 139 S. Ct. at 543).

The record here shows that Plaintiffs and other Amazon Flex drivers "frequently" performed last mile deliveries, and Amazon cannot paper over this reality by arguing that "[l]ast leg deliveries are irrelevant" because that is not what this case is about. Defs.' Br. at 24. The salient question is the "class of workers," not the class of claims.

### D. Amazon Flex drivers' tip-producing work is engagement in interstate commerce.

Moreover, even if the tipped work done by Amazon Flex drivers were the only work to be considered, these workers still fit within the § 1 exemption. Amazon claims that the tip-eligible deliveries are "purely local," Defs.' Br. at 2, but that is not true. The tip-eligible work performed by the Amazon Flex drivers entailed driving to an Amazon-owned warehouse or Whole Foods to pick up goods

---

trying to claim (namely, that the later sections should be read to narrow the scope of the § 1 exemption).

purchased by consumers online, then transporting those goods to consumers, and returning any undeliverable goods to Amazon's facilities. *See* Miller Decl. ¶¶ 5-8 (ER-53); Gleese Decl. ¶ 5-8 (ER-57); Lawson Decl. ¶¶ 5-7 (ER-61); Bocoum Decl. ¶¶ 5-9 (ER-65); Sullivan Decl. ¶¶ 5-9 (ER-69); Paschal Decl. ¶¶ 5-7 (ER-73); Kimmey Decl. ¶¶ 5-9 (ER-77). That Amazon considered only certain types of deliveries—or certain types of products—to be "tip-eligible" is immaterial because the overall nature of the work performed by the Amazon Flex drivers as a *class* is indistinguishable from the type of "last mile" delivery services in *Rittmann*. *See* 971 F.3d at 907. The tip-eligible deliveries performed by Amazon Flex drivers fit squarely within the holding in *Rittmann*, because these workers "pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination." 971 F.3d at 915.

Amazon attempts to cast the tip-eligible deliveries as consisting in large part of restaurant deliveries, *see* Defs.' Br. at 2, hoping to analogize this work to the work that the Seventh Circuit held to be insufficient to qualify GrubHub restaurant delivery drivers as workers in interstate commerce in *Wallace v. GrubHub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020). But restaurant deliveries constituted a very small fraction of the Amazon Flex drivers' work. Plaintiffs attest that they made restaurant deliveries on "a few occasions" or a "couple" of times at most.

Lawson Decl. ¶ 5 (ER-61); Bocoum Decl. ¶ 5 (ER-65); Paschal Decl. ¶ 5 (ER-73).
The relative insignificance of the Amazon Restaurants work is further confirmed
by the fact that it is "now discontinued," as Amazon admits. Defs.' Br. at 12. In
fact, Amazon Restaurants was closed due to Amazon's lack of success in breaking
into the restaurant delivery market, and an Amazon spokesperson conceded that
not many workers would be affected by the discontinuation of Amazon
Restaurants, stating: "A small fraction of Amazon employees are affected by this
decision." Sarah Perez, "Amazon Restaurants in US is Shutting Down,"
TechCrunch (June 11, 2019), *available at*
https://techcrunch.com/2019/06/11/amazon-restaurants-in-u-s-is-shutting-down/.
Amazon's efforts to analogize this case to one involving only restaurant delivery
drivers fails.

### E. At a minimum, the Court should order discovery on the scope of work performed by the Amazon Flex delivery drivers at issue in this case.

The record is clear that the class of workers in this case is not limited to
drivers who only ever performed tip-eligible work. Nothing of the sort is alleged in
the Second Amended Complaint, Plaintiffs attested in their declarations to their
frequent performance of last-mile deliveries, and Amazon sidestepped the issue
despite having all the records which would have established the precise work
performed by Plaintiffs. Moreover, the record is also clear that tip-eligible

deliveries include many deliveries that involve the transportation of goods in interstate commerce, such as deliveries of groceries and household goods.

However, to the extent that the Court determines that there is any ambiguity in the record on these points—namely, whether the class of workers performed non-tip-eligible work and the goods/deliveries included in tip-eligible work—it should order the parties to undertake discovery on these issues. That is what the Third Circuit ordered in *Singh v. Uber Technologies, Inc.*, 939 F.3d 210 (3d Cir. 2019), where the plaintiff argued that the § 1 exemption applied but the record did not suffice for the court to make that determination. The court explained that the question of whether the plaintiff "belongs to a class of transportation workers engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it . . . can be informed by various factors," and that the court may refer to "a wide variety of sources" in deciding this question. 939 F.3d at 227–28. The Third Circuit therefore remanded the *Singh* case back to the district court "along with instruction that it permit discovery on the question [of whether the class of workers in the case worked in interstate commerce] before entertaining further briefing." *Id*. at 228.

## II. PLAINTIFFS' CLAIMS CANNOT BE COMPELLED TO ARBITRATION UNDER STATE LAW.

### A. Plaintiffs cannot be compelled to arbitrate their claims under the 2016 TOS.

#### 1. Federal law applies to the arbitration provision in the 2016 TOS, and the arbitration provision is not enforceable under federal law.

Because the FAA exemption applies, Plaintiffs cannot be compelled to arbitration under the 2016 TOS. The 2016 TOS is clear that its arbitration provision is governed by the FAA and "applicable federal law" and that Washington state law only applies to that contract "except for Section 11 of this Agreement [the arbitration provision], which is governed by the Federal Arbitration Act and applicable federal law." *Id.*, § 12. This Court interpreted this language (in this precise document—the 2016 TOS) in *Rittmann* and concluded: "Because there is no law that governs the arbitration provision, . . . there is no valid arbitration agreement. We therefore reject Amazon's alternative bases to compel arbitration." 971 F.3d at 921.

The *Rittmann* decision on this point was well-reasoned and fully articulated. The Court held that Amazon's argument that Washington law should apply to the arbitration provision must be rejected under "[t]wo principles of contract interpretation," namely (1) that an unconscionable provision can be severed only when it can be done "'without essentially rewriting the contract'" and (2) that

contract ambiguities must be construed against the drafter. *Rittmann*, 971 F.3d at 920 (quoting *McKee v. AT&T Corp.*, 164 Wash. 372, 191 P.3d 845, 861 (2008) (en banc)). As the Court correctly noted, the 2016 TOS states that Washington law applies to everything in the contract ***other than*** the arbitration provision (Section 11), and "we cannot sever the clause that applies Washington law to the contract 'except for Section 11' from the governing law provision without impermissibly rewriting the contract." 971 F.3d at 920. The Court further noted that "Amazon cites no authority that would allow us to conclude that the presumption in favor of local law overcomes express contractual language that precludes its application." *Id*. at 920-21. The District Court here properly observed that "*Rittmann* is controlling as to the 2016 TOS" and held that Plaintiffs' claims could not be compelled to arbitration under the 2016 TOS. Dist. Ct. Op. at 11.

Amazon attempts to avoid the language in its own contract, arguing that parties must arbitrate under state law even when the FAA applies, "as their agreement requires." Defs.' Br. at 38. This argument fails right out of the gate because the 2016 TOS does not require arbitration under any law other than the FAA (and, as discussed in Section I.A, *supra*, the FAA does not apply). Amazon relies on this Court's decision in *Romero v. Watkins & Shepard Trucking, Inc.*, 2021 WL 3675074 (9th Cir. Aug. 19, 2021), in which the Court considered the governing state law after determining that the FAA exemption applies. In *Romero*,

however, the Court observed that, "[w]here the FAA does not apply, the Arbitration Policy selects Nevada law." *Id*. at \*2. Here, in contrast, no state law applies to the arbitration provision; only the FAA and federal law apply.

The Circuit Court decisions in *Saxon* and *Oliveira v. New Prime, Inc.*, cited by Amazon, are similarly distinguishable; those cases contain no mention of arbitration provisions explicitly stating that only the FAA and federal law apply. Those courts also declined to rule one way or the other on undeveloped arguments about the application of state law. *See Saxon*, 993 F.3d at 502 ("All we decide today is that the Federal Arbitration Act's policy favoring arbitration does not extend to Saxon's contract of employment under the plain text of § 1."); *Oliveira*, 857 F.3d 7, 24 n.21 (1st Cir. 2017) ("We do not wade into this dispute" about the potential application of state law.).[5]

Amazon attempts to avoid this Court's previous ruling on the precise document at issue—the 2016 TOS—by arguing that "*Rittmann* did not address the relevant question." Defs.' Br. at 43. Perplexingly, Amazon goes on to argue that

---

[5]     In *Harper v. Amazon.com Services, Inc.*, the Third Circuit did not hold that state law applied; it simply held that the case should be remanded to the district court to consider this question. 12 F.4th 287, 295 (3d Cir. 2021) ("Of course, that does not mean Washington law controls, or that Harper and Amazon have an agreement to arbitrate under state law at all. These are questions best considered by the District Court."). Similarly, here, if this Court determines that there is a question as to whether state law should apply (despite the 2016 TOS's clear statement that only federal law applies to the arbitration provision), it should remand the case to the District Court for consideration of that question.

*Rittmann* **did** address the relevant question—the application of choice-of-law principles to Amazon's 2016 TOS—but it just did so incorrectly. Defs.' Br. at 43-44. Amazon argues that, once the Court concluded that the 2016 "lacks an effective choice of law for the arbitration provision in Section 11," it should have applied the "most significant relationship" test to determine which law should apply. Defs.' Br. at 44. And, Amazon argues, under that test, "the laws of the states where Plaintiffs lived and performed services" should be applied. *Id*.

Amazon's argument is incorrect. First, contrary to Amazon's characterization, the parties did make an effective choice of law in the 2016 TOS. The law chosen is federal law and the FAA ("Section 11 of this Agreement . . . is governed by the Federal Arbitration Act and applicable federal law," 2016 TOS, § 12 (ER-110)); under the FAA, Amazon Flex drivers are exempt from having to litigate their claims in arbitration, so the arbitration provision in the 2016 TOS is not to be applied to their claims. Federal law applies to the arbitration provision, and the provision cannot be enforced as to Amazon Flex drivers under that chosen law. That is how the contract was written, and that is how it should be applied. Just because Amazon is not happy with the result of its own contract does not mean that its choice of law was ineffective.

### 2. The arbitration provision in the 2016 TOS is not enforceable under Washington law.

Second, Amazon is incorrect that "[t]he 'most significant relationship' test compels application of the laws of the states where Plaintiffs lived and performed services." Defs.' Br. at 44. Tellingly, Amazon simply states this, without any analysis or reasoning. In fact, applying the principles set forth in Restatement (Second) of Conflict of Laws, § 188, the state with the most significant relationship is Washington. Indeed, Amazon itself made that argument before the District Court, arguing that application of the "most significant relationship test" in this case "would most likely mean the law of Washington, where Amazon is headquartered and where Plaintiffs' Washington Consumer Protection Act putative nationwide class claims arise. . ." Defs.' Mot. to Compel. Arb. (ER-166), at 13. Amazon also argued that Washington law applies in *Rittmann*. *See* 971 F.3d at 919-20 ("Amazon . . . asserts that, in the event the FAA and federal law do not apply, Washington state law governs the arbitration provision . . . by applying choice-of-law principles.").

Amazon has likely moved away from its argument that Washington law applies because of the strong public policy in Washington disfavoring enforcement of arbitration provisions with class action waivers in consumer class cases. Under Washington law, a contract or contractual term may be held to be unconscionable (and therefore unenforceable) based on substantive unconscionability alone. *See*

44

*Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 346 (2004). The Washington

Supreme Court held in *Scott v. Cingular Wireless* that an arbitration provision with

a class action waiver was substantively unconscionable and unenforceable as to the

plaintiffs' claim under the Washington Consumer Protection Act. 160 Wash. 2d

843 (2007).[6]  Because "[c]onsumers bringing actions under the CPA do not merely

vindicate their own rights; they represent the public interest . . . ," "class actions

are a critical piece of the enforcement of consumer protection law." *Id*. at 853.

Accordingly, the court in *Scott* held that an arbitration provision with a class action

waiver was substantively unconscionable because "it drastically forestalls attempts

to vindicate consumer rights." *Id*. at 854. The court also held that the class action

waiver was unconscionable because it served as an exculpatory clause, "effectively

prevent[ing] one party to the contract, the consumer, from pursuing valid claims,

effectively exculpating the drafter from potential liability for small claims, no

matter how widespread." *Id*. at 857.

---

[6]      For cases in which the FAA applies to the parties' arbitration provision, the
ruling in *Scott* has been overruled by the Supreme Court's decision in *AT&T
Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). *See Coneff v. AT & T Corp*.,
673 F.3d 1155, 1159 (9th Cir. 2012). However, because the FAA does not apply
here, the Washington Supreme Court's ruling that class action waivers are
unconscionable applies. *See Waithaka v. Amazon.com, Inc*., 966 F.3d 10, 33 (1st
Cir. 2020) (giving effect to Massachusetts public policy holding class arbitration
waivers unenforceable and observing that such policies "remain intact [after
*Concepcion*] where, as here, the FAA does not preempt state law").

The ruling in *Scott* applies equally here. Amazon's arbitration provision contains a class action waiver. 2016 TOS, § 11(e) (ER-93). That waiver prevents Amazon Flex delivery drivers from being able to vindicate their rights fully and essentially exculpates Amazon from liability for the companywide practices challenged herein. Washington State has a "fundamental policy to protect consumers through the availability of class action," *McKee v. AT & T Corp.*, 164 Wash. 2d 372, 385, 191 P.3d 845, 852 (2008), and Amazon's arbitration provision conflicts with that policy. It is unconscionable and cannot be enforced.[7]

Amazon ignores *Scott*, not even citing it in its brief, instead citing to *Palco v. Airborne Express, Inc.*, 372 F.3d 588, 596 (3d Cir. 2004), for the proposition that courts "have already compelled arbitration under [Washington] law even when the contract was exempt (or potentially exempt) from the FAA." Defs.' Br. at 46-

---

[7]     Nor can the class action waiver be severed from the rest of the arbitration provision. This is true both by the provision's own terms and as a matter of law. First, the provision states both that "no arbitrator selected to arbitrate any dispute between the parties is authorized to arbitrate any dispute on a class, collective or representative basis" and that the agreement "shall not be interpreted as requiring either party to arbitrate disputes on a class, collective or representative basis." 2016 TOS, § 11(f), (g) (ER-93). By its language, the arbitration provision does not allow arbitration on a classwide basis—that is an integral aspect of the provision and cannot be severed. Second, for the same reasons noted in *Rittmann*, the class action waiver cannot be removed from the arbitration provision "without impermissibly rewriting the contract." 971 F.3d at 920.

47. But *Palcko* was an individual case, not a class action. As the Washington Supreme Court explained in *Scott*: "Class action waivers have very little to do with arbitration. Clauses that eliminate causes of action, eliminate categories of damages, or otherwise strip away a party's right to vindicate a wrong do not change their character merely because they are found within a clause labeled 'Arbitration.'" *Id.*

The fact is that "[t]he Washington Supreme Court has found that class action waivers are substantively unconscionable." *Schmidt v. Samsung Elecs. Am., Inc.*, 2017 WL 2289035, at *6 (W.D. Wash. May 25, 2017). Under *Scott*, Amazon's arbitration provision could not be enforced under Washington law because of the class action waiver.

### 3. The arbitration provision in the 2016 TOS is not enforceable under other states' laws.

Several of the states in which the named plaintiffs performed their work and under which laws the claims are brought have consumer protection policies that would conflict with compelling arbitration in this case. Specifically, Arizona, California, Florida, Illinois, Massachusetts, Missouri, North Carolina, Ohio, and Pennsylvania all consider arbitration provisions that include class waivers in the consumer context to be unenforceable.

**Arizona**: *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1081 (C.D. Cal. 2010) ("[T]he Class Action Waiver directly contravenes the public policy in Arizona's Consumer Fraud Act: 'to counteract the disproportionate

bargaining power often present in consumer transactions.'"). Amazon does not even cite a case compelling arbitration under Arizona law.

**California**:  *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 757-758 (9th Cir. 2015) (California vests consumers with a "number of unwaivable rights, including the right to a class action"). The case cited by Amazon is not a class action and does not address the unenforceability of arbitration provisions such as Amazon's, with class action waivers. *See Maldonado v. Sys. Servs. Of Am., Inc.*, 2009 WL 10675793 (C.D. Cal. June 18, 2009) (individual plaintiff claim relating to wrongful termination), cited at Defs.' Br. at 46.

**Florida**:  *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 575 (Fla. Dist. Ct. App. 1999) ("The arbitration clause . . . effectively removes Powertel's exposure to any remedy that could be pursued on behalf of a class of consumers" and is therefore unenforceable). In *Guidice v. Sage Corp.*, cited by Amazon, Defs.' Br. at 46, plaintiff does not appear to have made any argument about the arbitration provision not being enforceable under Florida law, nor does the record indicate whether or not the arbitration agreement at issue had a class action waiver. 2006 WL 8433427 (S.D. Fla. Nov. 6, 2006).

**Illinois**:  *Kinkel v. Cingular Wireless, L.L.C.*, 223 Ill.2d 1, 47, 857 N.E.2d 250 (2006) (denying motion to compel arbitration on basis that class action waiver was unconscionable under Illinois law). The case cited by Amazon, *Atwood v. Rent-A-Ctr. E., Inc.*, 2016 WL 2766656 (S.D. Ill. May 13, 2016), cited at Defs.' Br. at 46, involved an individual plaintiff's claim and did not address the enforceability of class arbitration waivers.

**Massachusetts**:  *Waithaka,* 966 F.3d at 33, 35 (Amazon's arbitration provision could not be enforced as to the Massachusetts claims because, "assuming Washington law would permit the class action waiver, Massachusetts law would oust the contractual choice of law of Washington as contrary to the Commonwealth's fundamental public policy and would govern the enforceability" of Amazon's arbitration provision). Amazon does not even cite a case compelling arbitration under Massachusetts law, no doubt because this precedent to the contrary is directly on point.

**Missouri**:  *Whitney v. Alltel Commc'ns, Inc.*, 173 S.W.3d 300, 314 (Mo. Ct. App. 2005) (class arbitration waivers unenforceable under Missouri law). The case cited by Amazon, *Parker v. New Prime, Inc.*, 2020 WL 6143596 (C.D. Cal. June 9, 2020), cited at Defs.' Br. at 46, does not support its point. There, the court held

simply that questions of arbitrability had been delegated to the arbitrator. 2020 WL
6143596, at *5 ("Plaintiff can raise her challenges regarding unconscionability
before the arbitrator.").[8]

**North Carolina**: *Tillman v. Com. Credit Loans, Inc.*, 362 N.C. 93, 108, 655
S.E.2d 362, 373 (2008) (under North Carolina law, arbitration provision with class
action waiver, *inter alia*, substantively unconscionable "because the provisions do
not provide plaintiffs with a forum in which they can effectively vindicate their
rights"). Amazon does not even cite a case compelling arbitration under North
Carolina law.

**Ohio:** *Eagle v. Fred Martin Motor Co.*, 809 N.E.2d 1161, 1183 (Ohio App. Ct.
2004) (arbitration provision containing class action waiver was unconscionable
under Ohio law). The case cited by Amazon, *W.L. Byers Trucking, Inc. v. Falcon
Transp. Co.*, 2010 WL 3724895 (N.D. Ind. Sept. 17, 2010), cited at Defs.' Br. at
46, involved individual, not class, claims.

**Pennsylvania**: *Thibodeau v. Comcast Corp.*, 912 A.2d 874, 886 (2006) ("Class
actions are still of great public importance. Class action lawsuits are and remain
the essential vehicle by which consumers may vindicate their lawful rights. The
average consumer, having limited financial resources and time, cannot individually
present minor claims in court or in an arbitration."). The case cited by Amazon,
*Mason v. Uber Techs., Inc.*, 2021 WL 5742563 (E.D. Pa. Dec. 2, 2021), cited at
Defs.' Br. at 46, involved individual, not class, claims.

Even if the laws of the states in which Plaintiffs performed deliveries were

somehow applicable to the 2016 TOS's arbitration provision (which they are not,

both because the 2016 TOS provides that only federal law applies to that provision

and, if any state's law were to apply, it would be Washington's), the laws of the

vast majority of those states prohibit enforcement of arbitration provisions

---

[8]     Amazon's arbitration provision is also unenforceable under Missouri law
because Missouri's Uniform Arbitration Act does not apply when the contract
containing the arbitration provision is a "contract of adhesion." Mo. Stat. §
435.350. Amazon's 2016 TOS is an adhesion contract.

containing class action waivers. Accordingly, Plaintiffs could not be compelled to arbitration under the arbitration provision in Amazon's 2016 TOS under those states' laws.

### B.    The arbitration provision in the 2019 TOS does not apply.

The 2019 arbitration does not apply to the claims in this case.[9]  The 2016 TOS contains a modification provision, which states: "any modifications to Section 11 [the arbitration provision] will not apply to claims that accrued or to disputes that arose prior to such modification." 2016 TOS, § 13. Accordingly, under the 2016 TOS, which is the version that Amazon admits applied initially to all of the named plaintiffs, the arbitration provision cannot be modified at all for "claims that accrued or to disputes that arose prior to such modification." *Id*., § 13 (ER-95). "In common parlance a right accrues when it comes into existence …. " *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013), *quoting U.S. v. Lindsay*, 346 U.S. 568, 569 (1954). "Thus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Here, Plaintiffs' claims indisputably accrued – that is, came into existence – before October 2019, given that the practices they challenge started in

---

[9]    As to two of the named plaintiffs, Emad Al-Kahlout and Hamady Bocoum, Amazon does not even argue that the 2019 TOS applies. Thus, there is no question that their claims cannot be compelled to arbitration, since the only arbitration provision at issue for those two individuals is indisputably the 2016 TOS.

2016 and ended in about August 2019. Accordingly, this provision applies to all claims at issue in this lawsuit and to putative class, which is defined in the Second Amended Complaint as all individuals who worked as Amazon Flex drivers until August 2019. 2d Am. Compl. ¶¶ 34, 45-57 (ER-181-185).[10]

The District Court properly held that, in light of this modification provision in the 2016 TOS, "the 2016 TOS was the operative contract at all relevant times." Dist. Ct. Ord. at 11 (ER-14). Amazon mischaracterizes the District Court's conclusion as being based on "[t]he court appear[ing] to believe that the 2019 TOS would need a 'provision' stating that it applied 'retroactively' for the new contract to serve as a basis for compelling arbitration of already-accrued claims." Defs.' Br. at 40. However, the District Court was merely observing that "Defendants do not claim that the 2019 TOS applies retroactively." Dist. Ct. Ord. at 11 (ER-14). In fact, the District Court clearly held that the 2016 TOS applied in light of the modification provision in that document, which it discussed in detail. Dist. Ct. Ord. at 4, n.5, 11 (ER-7, ER-14).

Amazon's only argument against the plain language in the 2016 TOS's modification provision is that it "is not relying on any 2019 TOS modifications to

---

[10]    The conclusion that the 2016 TOS's arbitration provision applies to this case is further bolstered by the "Survival" provision of the 2016 TOS, which states that the arbitration and governing law sections of the 2016 TOS "will survive any termination or expiration of this Agreement." 2016 TOS, § 16(b) (ER-95).

Section 11 because the operative language in Section 11(a) did not change in any material way between the 2016 and 2019 TOS versions. . . Amazon's argument instead rests on a change to Section 12, the choice-of-law provision." Defs.' Br. at 40-41 n.6. This argument (which Amazon has tellingly buried in a footnote, indicating its lack of conviction about the argument) must fail. Section 12 of the 2019 TOS states: "If, for any reason, the Federal Arbitration Act is held by a court of competent jurisdiction not to apply to Section 11 *of this Agreement*, the law of the state of Delaware will govern Section 11 *of this Agreement*. . ." 2019 TOS, § 12 (ER-110-111) (emphasis added). But Section 11 "of this Agreement," *id*., *i.e.*, of the 2019 TOS, does not apply here, because the modification provision in the 2016 TOS provided that the arbitration provision in the 2016 TOS could not be modified as to the claims in this case. Because Section 11 of the 2019 TOS does not apply here, neither does the Delaware choice of law provision. The applicable choice of law provision here remains the one in the 2016 TOS, which provides that Washington law governs except for the arbitration provision, which is governed by the FAA. *See* Section II.A, *supra*.[11]

---

[11] Moreover, though Amazon claims that there was no "material" change in the arbitration provision between the 2016 TOS and the 2019 TOS, in fact, "the 2019 and 2021 versions of the TOS . . . changed the delegation provision of the arbitration agreement to require the parties to arbitrate questions of arbitrability." Dist. Ct. Ord. at 4 n.6 (ER-7). Amazon avoids mentioning this and does not argue here (nor did it argue to the District Court, *see* Dist. Ct. Ord. at 4 n.6 (ER-7)) that

Because the 2016 TOS protected against modification of its arbitration provision (and the 2016 TOS's arbitration provision survived that contract's termination), Amazon is incorrect that "the 2019 TOS supersed[ed] and replace[d] the parties' prior agreements.'" Defs.' Br. at 42. In fact, the 2019 TOS does not supersede the 2016 TOS's arbitration provision by its own language, as the 2019 TOS provides only that "[t]his Agreement constitutes the complete and final agreement of the parties pertaining to *the Services* and supersedes and replaces the parties' prior agreements, understandings, representations, and discussions (whether written or oral) relating to *the Services*." 2019 TOS, § 16(a) (ER-112) (emphasis added). The "Services" is defined in the 2019 TOS as "the delivery services contemplated by this Agreement." *Id*. at 1 (ER-104). As such, contrary to Amazon's argument, the 2019 TOS *does not* supersede the 2016 TOS's arbitration provision; it only supersedes the 2016 TOS insofar as it relates to the delivery services themselves. Moreover, the claims in this case all accrued before the 2019 TOS in any event, and its provisions therefore cannot be said to apply to these claims.[12]

_____

the 2019 delegation provision applies here. This confirms that Amazon acknowledges that the 2016 arbitration provision is the applicable one.

[12] Amazon also cannot enforce the terms of the 2019 TOS because it has failed to demonstrate any sort of "meeting of the minds" between the parties. According to Amazon, when it changed its 2019 TOS, it emailed its Flex drivers and informed them that, "[b]y continuing to use the Amazon Flex app, you accept the Terms of

## C.     The arbitration provision in the 2021 TOS does not apply.

Amazon cursorily states in a footnote:  "two of these eleven Plaintiffs also

accepted a more recent 2021 TOS. It may technically be the operative agreement

for their obligation to arbitrate, but there is no dispute that they must arbitrate

under the 2021 TOS if they have a duty to arbitrate under the 2019 TOS." Defs.'

Br. at 42 n.7. For the same reasons discussed in section II.B, *supra*, the arbitration

provision in the 2021 TOS does not apply because section 13 of the 2016 TOS

does not allow its arbitration provision to be modified with respect to already-

accrued claims.

---

Service, as updated." Defs.' Br. at 9. However, such "browsewrap" agreements –
that is, an agreement that requires no affirmative manifestation of assent such as a
signature of the click of an "I Agree" button, but which instead imply assent based
on a party simply using the product or accessing the website – are not, by
themselves, sufficient to establish the existence of a binding, legitimate contract.
*See, e.g.*, *Kwan v. Clearwire Corp.*, 2012 WL 32380 (W.D. Wa. Jan. 3, 2012)
(denying motion to compel arbitration where defendant failed to demonstrate that
the plaintiff clicked an "I agree" button or otherwise affirmatively manifested her
assent to contract containing arbitration provision, and rejecting defendant's
argument that plaintiff's assent could be implied by her continued use of the item
she has obtained from the defendant); *Specht v. Netscape Comm'ns Corp.*, 306
F.3d 17 (2d Cir. 2002) (company failed to establish reasonably conspicuous notice
of arbitration policy in online agreement where there was no visible indication that
clicking a button to download software meant that users had agreed to the policy,
and where policy was only available if users scrolled down the screen and clicked
a link reading "License & Support Agreement"); *Ajemian v. Yahoo!, Inc.*, 987
N.E.2d 604, 613 (Mass. App. Ct. 2013) (defendant's terms of service policy did
not bind user where the "record does not establish that the TOS was a clickwrap
agreement, or that terms of the TOS were displayed (in whole or part) to [the
users], or that the terms were accepted by clicking 'I accept' or by taking some
similar action. . .").

**CONCLUSION**

Plaintiffs are part of a class of workers engaged in foreign or interstate commerce and are therefore exempt from the FAA. Because federal law applies to Amazon's arbitration provision and Plaintiffs cannot be required to arbitrate under federal law, Plaintiffs must be permitted to pursue their claims in Court. For this reason and the other reasons set forth above, this Court should affirm the District Court's decision denying Amazon's motion to compel arbitration.

Respectfully submitted,

JENNIFER MILLER, EMAD AL-KAHLOUT, JOSE GRINAN, KELLY KIMMEY, JUMA LAWSON, HAMADY BOCOUM, PHILIP SULLIVAN, KIMBERLY HALO, CHRISTOPHER CAIN, GARY GLEESE, CLARENCE HARDEN, STEVEN MORIHARA, SHARON PASCHAL, on behalf of themselves and all others similarly situated,

By their attorneys,


 */s/ Hillary Schwab*
Hillary Schwab, Esq.
Brant Casavant, Esq.
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3261
Fax:  (617) 488-2261
hillary@fairworklaw.com
brant@fairworklaw.com


Beth E. Terrell, Esq.
Toby J. Marshall, Esq.
Jennifer Rust Murray, Esq.
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
(206) 816-6603
bterrell@terrellmarshall.com
tmarshall@terrellmarshall.com
jmurrary@terrellmarshall.com

Dated:  October 26, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2022, I electronically filed the foregoing Plaintiffs-Appellees' Answering Brief with the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Notice of this filing will be sent to counsel for all parties through the Court's ECF system.

*/s/ Hillary Schwab*
Hillary Schwab

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** _____21-36048_____

I am the attorney or self-represented party.

**This brief contains** _____**13,893**_____ **words,** excluding the items

exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with

Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___s/ Hillary Schwab_____ **Date** ___October 26, 2022___
*(use "*s/[typed name]*" to sign electronically-filed documents)*